UNITED STATES of America, Appellee,

v.

Santano CORONEL–QUINTANA, a/k/a Santana Coronel-Quintana, Appellant.

UNITED STATES of America, Appellee,

v.

Inocencio CORONEL, Appellant.

Nos. 84–1699, 84–1700.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1984.

Decided Jan. 16, 1985.

Rehearing and Rehearing En Banc Denied Feb. 21, 1985 in No. 84–1699.

---

Ruth Kronlokken, St. Paul, Minn., for appellant Quintana.

Keven B. Spaeth, Grand Forks, N.D., for appellant Coronel.

Gary Annear, Asst. U.S. Atty., Fargo, N.D., for appellee.

Before HEANEY, ROSS and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

Santana Coronel-Quintana was convicted of knowingly, intentionally, and unlawfully distributing heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, conspiring to distribute heroin in violation of 21 U.S.C. § 846, and unlawfully carrying a firearm during the commission of a felony in violation of 18 U.S.C. § 924(c)(2). He received a total sentence of fifteen years plus three years special parole.[1] Inocencio Coronel

---

1. Santana was sentenced to fifteen years plus three years special parole for the distribution conviction, fifteen years for the conspiracy conviction, and five years for carrying a firearm during the commission of a felony. All three sentences were to run concurrently.

was convicted of the same offenses as Santana, as well as attempting to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, receiving a firearm transported through interstate commerce in violation of 18 U.S.C. § 922(h), and illegal reentry into the United States after deportation in violation of 8 U.S.C. § 1326. He received a total sentence of twenty-seven years plus ten years special parole.[2] Both defendants raise numerous claims for reversal which we discuss in *seriatim.*

## I. BACKGROUND.

This appeal arises from the defendants' participation in an illegal drug transaction in North Dakota. A confidential informant met with two drug enforcement agents and offered to supply them with information concerning drug trafficking in the Grafton, North Dakota, area. The informant named three brothers, Inocencio Coronel, Jesus Coronel-Quintana, and Santana Coronel-Quintana as potential contacts, and Carmen Rodriguez as the "middleman." The agents opened a file on these men and arranged a "sting" operation. The informant introduced the agents to Rodriguez, who told them that he could supply them with heroin and cocaine purchased in California, and that he knew two men in the Grafton area who could also supply them with these drugs. (Tr. 18) Through a series of telephonic negotiations, which were recorded by the government agents, the initial purchase was scheduled for November 30, 1983. Jesus's supplier told him that the deal looked too suspicious and backed out of the deal. (Tr. 701) The agents remained in contact with Rodriguez, however, and a purchase was scheduled for December 22, 1983. This transaction resulted in the arrests of Santana, Inocencio,

Jesus, Rodriguez, and Andres Diaz-Quintana.[3]

## II. DISCUSSION.

### A. Denial of Continuance.

Santana and Inocencio contend that the district court erred in denying their motion for a continuance when it was discovered that the preliminary hearing recording was not transcribable. They argue that, because the district court denied their motion for a continuance so they might transcribe the tape, they were deprived of their right to effectively cross-examine and impeach one of the government's undercover agents. Apparently, the agent testified at the preliminary hearing that he was unsure of the heroin source but later testified at trial that Santana was the source of the heroin. (Tr. 157)

■ Because a trial judge must balance a number of considerations in determining whether or not to grant a continuance, he must be afforded substantial discretion, *United States v. Little,* 567 F.2d 346, 348–49 (8th Cir.1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1608, 56 L.Ed.2d 60 (1978), and denial of a continuance will constitute reversible error only if the judge clearly abuses this discretion. *United States v. Reed,* 658 F.2d 624, 627 (8th Cir.1981), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *United States v. Wolf,* 645 F.2d 665, 667 (8th Cir.1981). In *Little,* this Court noted the following five factors that the trial judge must consider in determining whether to grant a continuance:

> 1) the nature of the case and whether the parties have been allowed adequate time for trial preparation;

**2.** Inocencio was sentenced to fifteen years plus ten years special parole for the heroin distribution conviction and fifteen years each for conspiring to distribute heroin and attempting to distribute cocaine. These three sentences were to run concurrently. He received a ten-year sentence for carrying a firearm during the commission of a felony and a five-year sentence for receiving a firearm through interstate commerce as a felon. These sentences were to run concurrently, but consecutively with the fifteen-

year sentences. Inocencio also was sentenced to two years for illegal reentry after deportation. This sentence was to run consecutively with the other sentences.

**3.** Both Jesus Coronel-Quintana and Carmen Rodriguez pled guilty to the charges against them. Andres Diaz-Quintana was acquitted of the charges against him.

2) the diligence of the party requesting the continuance;

3) the conduct of the opposing party and whether a lack of cooperation has contributed to the need for a continuance;

4) the effect of the continuance and whether a delay will seriously disadvantage either party;

5) the asserted need for the continuance, with weight to be given sudden exigencies and unforeseen circumstances.

*United States v. Bernhardt*, 642 F.2d 251, 252 (8th Cir.1981) (citing *Little*, 567 F.2d at 348–49).

■ The defendants were given copies of the tapes prior to trial, and had an opportunity to listen to them and obtain whatever information they could from them. A continuance would not have solved the problem of the discrepant testimony because the tapes were simply unintelligible. Moreover, the defendants' counsel were at the preliminary hearing, and therefore were fully aware of the discrepancies in the agent's testimony. They could have brought out this discrepancy during cross-examination under Rule 613 of the Federal Rules of Evidence without the preliminary hearing transcript, yet they failed to do so. Thus, reviewing the record in light of the factors listed in *Little*, we conclude that the district court did not abuse its discretion in denying the defendants' motion for a continuance.

## B. Production of the Confidential Informant.

■ In their pretrial motions, the defendants moved for disclosure of the identity of the government's confidential informant, Carlos Perez. Relying on the prosecution's statement that Perez was a "mere tipster," the district court denied their motion. The defendants argue that the district court erred in denying their motion and, as a result, they were denied an opportunity to develop an entrapment defense.

They also contend that Perez had evidence that would have substantially impeached the credibility of the prosecution's witnesses. Although it is apparent from the record that Perez actively participated in the transaction and therefore was more than a "mere tipster," we find that there was no denial of due process under these circumstances.

In *United States v. Barnes*, 486 F.2d 776, 778–79 (8th Cir.1973), we noted that where the informant was "an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense." *Id.* at 779. *See also United States v. Bruneau*, 594 F.2d 1190, 1197 (8th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979). However, even if we conclude that the government should have disclosed the confidential informant's identity prior to trial, the defendants suffered no material prejudice from the government's failure to do so. It is clear from the record that the defendants knew the informant's name and where he was residing before trial. Moreover, the defendants knew that Perez was present throughout the negotiations and during the transaction, and could have subpoenaed him if they believed he had evidence that would have exonerated them. Yet they did not do so.[4] Therefore, we conclude that they suffered no prejudice from the denial of their motion to disclose. *See, e.g., Bruneau*, 594 F.2d at 1197–98; *United States v. DeAngelis*, 490 F.2d 1004, 1010 (2d Cir.), *cert. denied*, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974).

## C. Severance.

■ Santana and Inocencio argue that the district court abused its discretion in denying their motions for severance. However, neither defendant renewed his motion for severance at the close of the government's case nor at the conclusion of all the evidence, and therefore they waived their

---

4. Santana's attorney learned that Perez was the informant prior to trial, and telephoned him at the home of the chief of police in Rugby, North Dakota. He was told by Perez that he would have to go through the district attorney if he wanted to speak to Perez. However, the defendant took no further action to produce Perez.

request for a separate trial. *United States v. Reed,* 658 F.2d at 629; *United States v. Brim,* 630 F.2d 1307, 1310 (8th Cir.1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981). In any event, denial of their motions for severance was not error. "The general rule is that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." *United States v. Lee,* 743 F.2d 1240, 1248 (8th Cir.1984). *See also United States v. Krevsky,* 741 F.2d 1090, 1094 (8th Cir.1984); *United States v. Miller,* 725 F.2d 462, 467 (8th Cir.1984). "A defendant must show more than that his chances for acquittal would have been greater had he been tried separately." *Lee,* 743 F.2d at 1248. Rather, the defendant must show that he was prejudiced by the denial for severance, and this prejudice must be "clear" and "real." *Miller,* 725 F.2d at 467.

█ The defendants argue that, because they were not charged in all counts of the indictment and because the amount of evidence concerning each defendant's participation in the transaction was disproportionate, the jury was unable to separate the evidence and consider each defendant individually. This argument is without merit. The fact that Andres Diaz-Quintana, who was tried with Santana and Inocencio, was acquitted of all charges against him attests to the jury's diligence in considering each defendant's case individually.

Santana also argues that he was prejudiced by the denial for severance because Inocencio would have testified on Santana's behalf had they been tried separately. Inocencio chose not to testify at trial because information that would have been highly prejudicial to him would have been admitted into evidence.[5] However, we cannot say that Santana suffered any clear and

real prejudice. Santana does not indicate what Inocencio could have testified and how that testimony would have exonerated him. Moreover, both Jesus Quintana and Carmen Rodriguez testified that Santana was not a part of the conspiracy, yet the jury apparently chose not to believe this testimony. Therefore, we conclude that the district court did not abuse its discretion in denying the defendants' motion for severance.

### D. Motion in Limine.

█ Inocencio initially intended to testify concerning his involvement in the heroin sale. Because he feared that the details surrounding a prior conviction would be brought out on cross-examination, however, and because these details were extremely prejudicial to Inocencio's defense,[6] Inocencio sought to limit the prosecution's inquiry to the fact of his convictions and preclude any inquiry into the circumstances surrounding these convictions. The district court denied this request and Inocencio did not testify. Inocencio contends that the district court's ruling effectively precluded him from testifying on his own behalf and that the district court abused its discretion because the details of the prior conviction were not probative to any of the elements or issues of the crimes charged.

The Supreme Court recently held that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Luce v. United States,* —— U.S. ——, 105 S.Ct. 460, 464, 83 L.Ed.2d 443, (1984). Under Federal Rule of Evidence 609(a)(1), a court may prohibit the introduction of a witness's prior conviction for the purpose of attacking the witness's credibility if the court determines that the probative value of admitting this evidence is outweighted by the evidence's prejudicial effect to the defendant.

---

**5.** See *infra* at part D.

**6.** In 1976, Inocencio pled guilty to charges of selling heroin and assault on a police officer with a deadly weapon. Both charges arose from a narcotics transaction in California. After the narcotics and money had been ex-

changed, the undercover officer drew his weapon, identified himself as a police officer, and ordered Inocencio to place his hands on the dashboard of the car. Inocencio drew a pistol from the console next to his car seat and shot the police officer.

When the defendant does not testify, however, a reviewing court does not have the precise nature of the defendant's testimony, and "[a]ny possible harm from the district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative." *Id.* at ——, 105 S.Ct. at 462–63.

### E. Sentencing.

Inocencio next contends that, although the sentence he received was within the statutory limits, the district court abused its discretion in fixing the sentence by considering materially false information. At the time Inocencio was sentenced, the district court stated:

> This lengthy sentence has been imposed on you, Mr. Coronel, because the record is very clear [that] you are a very dangerous individual and you have demonstrated a willingness to kill to achieve your objectives and the only way that people can be protected from someone with your attitude and your willingness to commit crimes is to have you incarcerated.

Inocencio claims that the district court considered the allegedly perjured testimony of two government agents who testified that when they arrested him, Inocencio went for a loaded pistol hidden in the back waistband of his pants.

■ Although this Court will not substitute its judgment for that of the district court in questions of sentencing, *United States v. Russell,* 724 F.2d 725, 726 (8th Cir.1984), a sentence imposed upon material misinformation or erroneous assumptions violates due process. *Townsend v. Burke,* 334 U.S. 736, 740–41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); *United States v. Catch the Bear,* 727 F.2d 759, 761 (8th Cir.1984). However, we cannot say that the district court based Inocencio's sentence on materially false information because Inocencio's conclusory allegations of perjury do not prove that the agent's testimony was false. Moreover, the district court had evidence that Inocencio had previously been given a sentence of five years

to life for shooting a police officer during an arrest for selling heroin in California. Thus, we conclude that the district court did not abuse its discretion in sentencing Inocencio.

### F. Phone Monitoring.

■ Santana contends that the district court erred in denying his motion to dismiss the indictment when it learned that his telephone calls from the Grand Forks County Jail were being monitored. He alleges that these calls were confidential, and that the monitoring impeded his right to consult with his attorney, thereby violating his fourth, fifth, and sixth amendment rights.

In *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), the Supreme Court specifically stated that, absent demonstrable prejudice or substantial threat of such prejudice, dismissal of the indictment is plainly inappropriate when an individual's fourth, fifth, or sixth amendment rights have been violated, and "[t]he remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression." *Id.* at 365–66, 101 S.Ct. at 668. *See also United States v. Solomon,* 679 F.2d 1246 (8th Cir.1982). Santana does not allege, nor can we conclude from the record, that any information gained from this monitoring was used by the prosecution against Santana. Accordingly, we find that the district court properly denied Santana's motion to dismiss the indictment.

### G. Suppression.

Santana also argues that the district court erred in denying his motion to suppress a revolver seized from him in a search incident to his warrantless arrest. He alleges that the government agents had insufficient probable cause to arrest him without a warrant, and therefore the seizure violated his fourth amendment rights.

■ Following a hearing, the district court found that, considering the totality of the circumstances surrounding Santana's

arrest, probable cause was clearly present. This finding may not be set aside unless it is clearly erroneous. *United States v. Everroad,* 704 F.2d 403, 405 (8th Cir.1983); *United States v. Childress,* 721 F.2d 1148, 1150 (8th Cir.1982), *aff'd on rehearing,* 715 F.2d 1313 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984). "The existence of probable cause to make a warrantless arrest depends upon 'whether, at the moment the arrest was made, * * * the facts and circumstances within (the arresting officer's) knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *United States v. Clark,* 743 F.2d 1255, 1260 (8th Cir.1984) (citations omitted). This determination must not rest on isolated facts, but rather on the cumulative effect of the facts in the totality of the circumstances. *Everroad,* 704 F.2d at 406.

■ The government agents based their belief that probable cause existed to arrest Santana on (1) the informant's tip that Santana would transport the heroin to North Dakota from the West Coast; (2) a telephone conversation between the agents and Carmen Rodriguez in which Rodriguez substantially confirmed that Santana was the source of the heroin; (3) the informant's tip that Santana was armed and keeping the agents under surveillance as they were negotiating the transaction at the Ramada Inn; and (4) the agents' own observation that Santana and Andres were keeping them under surveillance. Viewing the facts in their totality, together with the rational inferences that may be drawn from them, we believe that the district court's ruling that the agents had probable cause to arrest Santana was not clearly erroneous. Accordingly, the district court properly denied Santana's motion to suppress the revolver seized incident to that arrest.

### H. Voir Dire.

Santana next contends that the district court erred in denying his motion to have voir dire translated in Spanish. He argues that because voir dire was not translated, he could not effectively assist his counsel and, therefore, he was denied a fair trial and due process. We disagree.

■ The appointment of an interpreter lies within the sound discretion of the trial judge. 28 U.S.C. § 1827(d); *United States v. Tapia,* 631 F.2d 1207, 1210 (5th Cir. 1980). Because the decision to appoint an interpreter will likely hinge upon a variety of factors, including the defendant's understanding of the English language, and the complexity of the proceeding, issues, and testimony, the trial court, being in direct contact with the defendant, should be given wide discretion, *United States v. Carrion,* 488 F.2d 12, 14 (1st Cir.1973), *cert. denied,* 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974), and this decision should not be disturbed unless the trial court clearly abuses its discretion. *United States v. Salsedo,* 607 F.2d 318, 320 (9th Cir.1979); *United States v. Sosa,* 379 F.2d 525, 527 (7th Cir.), *cert. denied,* 389 U.S. 845, 88 S.Ct. 94, 19 L.Ed.2d 111 (1967). Our review of the record indicates no such abuse of discretion.

■ Santana had lived and worked in the United States for at least seven years. Because he once lived in the area from which the venire panel was selected, he wanted voir dire translated into Spanish so that if he knew someone, or if a name was mentioned with which he was familiar, he could pass that name on to his counsel, and confer with him about the individual. However, we agree with the district court that translating the entire proceeding into Spanish was unnecessary. An interpreter was present throughout voir dire and was seated at the defendant's table. If Santana recognized someone on the venire panel, or a name was mentioned with which Santana was familiar, he could have consulted with his attorney through the interpreter. Moreover, if they had any other questions, the interpreter was readily available to him. Therefore, we conclude that the district court adequately protected Santana's right to be present and participate in the jury selection, and accordingly, we find no

abuse of discretion in its refusal to translate the entire voir dire proceeding into Spanish.

### I. **Sufficiency.**

The defendants' final allegation [7] is that the evidence was insufficient to support their convictions and, therefore, the district court erred in denying their motions for judgment of acquittal.

 The defendants' convictions must be upheld if, viewing the evidence in the light most favorable to the government, there is substantial evidence to support the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Hudson*, 717 F.2d 1211, 1213 (8th Cir.1983). In reviewing the jury's verdict, we give the government the benefit of all inferences that may reasonably be drawn from the evidence. *Hudson*, 717 F.2d at 1213; *United States v. Richmond*, 700 F.2d 1183, 1189 (8th Cir.1983); *United States v. Cox*, 580 F.2d 317, 323 (8th Cir.1978), *cert. denied*, 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979). Moreover, it is unnecessary that the evidence exclude every reasonable hypothesis except guilt; rather, the evidence must simply be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty. *United States v. Bentley*, 706 F.2d 1498, 1508 (8th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984); *United States v. Richmond*, 700 F.2d at 1189; *United States v. Archambault*, 670 F.2d 800, 801 (8th Cir.1982). Finally, the essential elements of the charge may be proven by circumstantial, as well as direct evidence. *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954); *Hudson*, 717 F.2d at 1213; *Rich-*

*mond*, 700 F.2d at 1189. Viewing the evidence under these standards, we believe that the district court did not err in denying the defendants' motions for judgment of acquittal.

Concerning Inocencio's claim, we have no doubt that the evidence was sufficient to support the convictions. Our review of the record indicates that there was ample evidence for the jury to find that he knowingly and actively participated in the heroin transaction, and also that he offered one of the agents what later proved to be cocaine.

 Santana's claim, however, presents a much closer case. The prosecution's case against Santana showed that on December 1, 1983, the day after Carmen Rodriguez's source backed out of the initial transaction, a series of alternating telephone calls was made from Jesus's trailer to the undercover agents in Fargo, North Dakota, and to a number registered in Santana's name in California.[8] Jesus denied making these calls but testified "[t]hat must have been when Carmen was talking about buying drugs." The evidence also indicated that the heroin was to arrive in North Dakota from a West Coast source, and that this source needed fifteen to sixteen hours notice before delivery could be made in North Dakota.

Moreover, in a recorded telephone conversation between Rodriguez and the agents at 9:15 a.m. on December 22, 1983, Rodriguez stated that, although the heroin had not yet arrived, the persons transporting it had called "about an hour, an hour and a half ago" and, at that time, they were "maybe about five hours away." When one of the agents asked Rodriguez, "Who'd you talk to, Santana[?]", Rodriguez

---

7. Santana also raises issues concerning remarks made during opening statement and closing argument. We have reviewed these issues and find them to be without merit.

8. Between 12:00 noon and 1:00 p.m., the following calls were made from Jesus's trailer:
 1) At 12:00 noon, to the number registered under Santana's name in California lasting four minutes;

 2) At 12:05 p.m., to the number of the undercover agents in Fargo lasting seven minutes;
 3) At 12:24 p.m., a second call to the same number in California lasting eight minutes;
 4) At 12:52 p.m., to the undercover agents in Fargo lasting six minutes; and
 5) At 12:58 p.m., to the number in California lasting seventeen minutes.

replied, "Ah, yeah." The record shows that Santana and Inocencio arrived from the West Coast sometime between 11:00 a.m. and 12:00 noon that day.

In another recorded telephone conversation between an agent and Carlos Perez shortly after Santana and Inocencio arrived at Jesus's trailer, Perez told the agent that the heroin had arrived and it was in the automobile Santana had driven from the West Coast. Furthermore, Agent Kemmet testified that Inocencio stated he and Santana had trouble bringing the heroin into North Dakota due to bad weather.[9]

Santana argues that he was unaware that Jesus and Rodriguez were transacting a heroin sale, and that the only reason he went to the Grand Forks Ramada Inn that night was to celebrate the holidays with his brothers, Jesus and Andres. He alleges that Jesus told them he had something to attend to earlier in the evening, but that he would meet them at the Ramada Inn between 10:00 p.m. and 11:00 p.m. Although Santana and Andres arrived at the hotel around 4:00 p.m., Santana contends they went into the hotel early because they saw Jesus's car parked at the hotel and believed Jesus had finished his business early. However, Santana also testified that he knew Carmen Rodriguez and Carlos Perez had taken Jesus's car, and therefore Jesus would be driving another vehicle. Moreover, when Santana and Andres saw Rodriguez and Perez in the hotel lounge, neither one approached them to ask whether Jesus was at the hotel; rather, they ignored Rodriguez and Perez.

Finally, the two agents negotiating with Rodriguez testified that they observed Santana move about the hotel, keeping them under surveillance and that Rodriguez told them that the individuals who transported the heroin would have to count the money at the hotel before the transaction could be made final.

Although this evidence linking Santana to the heroin transaction is primarily cir-

cumstantial, the elements of a crime may be proven by circumstantial as well as direct evidence. *Holland*, 348 U.S. at 140, 75 S.Ct. at 137; *Hudson*, 717 F.2d at 1213; *Richmond*, 700 F.2d at 1189. Giving the government the benefit of all inferences that may be drawn from this evidence, we believe there is substantial evidence to support the jury's verdict.

Having found no error, the judgment of the district court is affirmed.

---

**9.** The record shows that the day Santana and Inocencio arrived, the temperature was approximately thirty degrees below zero, and Santana was having trouble with his car due to the cold temperatures. Moreover, there is evidence in the record that the roads in the area were icy.